## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Johnny M. Ruffin, # K80541 | |
| Petitioner, | |
| | Case No. 3:20-cv-50050 |
| v. | |
| | Honorable Iain D. Johnston |
| David Mitchell[1], as Warden of Pinckneyville Correctional Center, | |
| Respondent. | |

## MEMORANDUM OPINION AND ORDER

On June 26, 1999, Petitioner Johnny M. Ruffin ("Ruffin") shot Brad Plaza, Chris Cummings, and Michael Vella in what he argued was self-defense. Although Chris Cummings and Michael Vella survived, Brad Plaza did not. After a jury trial, Ruffin was convicted of second-degree murder and two counts of aggravated battery with a firearm. A long and complicated procedural history followed in state court that included multiple amended post-conviction petitions and the death of Ruffin's appointed counsel. Having exhausted the state process, Ruffin now petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254 for what he sees as a violation of his Fourteenth Amendment rights under *Brady v. Maryland*, 373 U.S. 83 (1963). Seeing no error in the Illinois appellate court's decision, the Court denies Ruffin's petition.

---

[1] The Court automatically substitutes Warden David Mitchell as the Respondent under Federal Rule of Civil Procedure 25(d) because he is now the Warden of Pinckneyville Correctional Center.

## I. Background

The facts recited here are taken from the Illinois appellate court's opinions on direct appeal and on post-conviction petition. Dkt. 21-1; *People v. Ruffin*, 2018 IL App. (2d) 170324-U. "After AEDPA, we are required to presume a state court's account of the facts correct, and the petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence." *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Here, the Illinois appellate court was the last state court of record because Ruffin's petition for leave to appeal to the Illinois Supreme Court was denied. Furthermore, the appellate court incorporated the facts statement from its prior decision on direct appeal. *People v. Ruffin*, 2018 IL App. (2d) 170324-U, ¶ 6.

### a. June 26, 1999

In the early morning hours of June 26, 1999, a group of people were socializing at Vanessa Mazzola's apartment. Among other people, this included Mazzola, Brad Plaza, Heather Dresser, Jamie Hendrickson, Michael Vella, Thomas Hannah, and both Michael and Chris Cummings. Hendrickson testified at trial that Ruffin approached her and groped her inappropriately multiple times, even after she retreated to Michael Cummings—her boyfriend—for cover. After that, Hendrickson, Dresser, and Plaza left the scene, but returned within a few moments after Hendrickson told Dresser and Plaza what happened. When they returned, Plaza went to confront Michael Cummings (he was upset that Michael Cummings had not done anything about the incident), and Dresser approached Ruffin.

Dresser then yelled at Ruffin that he needed to learn some manners. Ruffin then pushed her, and so she slapped him in the face. In response, Ruffin struck her in the face. That prompted Brad Plaza, Thomas Hannah, and Michael Cummings to approach Ruffin. Ruffin also testified that Plaza had tried to punch him but missed. He also explained that a total of six or seven people were approaching him and that one had a beer bottle. Regardless, Ruffin then pulled out a gun and ran toward a nearby tree. Following him, Plaza attempted to reach for the gun, but Ruffin began firing because he thought someone might take his gun and use it against him. In the end, Ruffin shot Plaza in the neck, left shoulder, and back. Plaza later died from his injuries. Ruffin's shots also hit both Michael Vella and Chris Cummings (Michael Cummings' cousin). Both were shot in the leg while running away. These injuries were the reason Ruffin was eventually charged and convicted of aggravated battery with a firearm.

After the shooting, Ruffin fled the scene and stole a car at gunpoint, so that he could drive to Chicago. The owner then called the police and gave a description of the stolen car. About an hour later, a Kane County Sheriff's deputy spotted the car and pulled Ruffin over. Although Ruffin initially complied by pulling over, he then fled the scene again and led law enforcement on a high-speed chase that reached speeds of 100 miles per hour. State police ended the chase by ramming the vehicle, causing it to roll over onto its roof. Two deputies then approached the vehicle and one observed Ruffin pointing a gun at them, though Ruffin disputes that point. Regardless, the deputy fired five shots and incapacitated Ruffin, ending the ordeal.

### b. Prior Interactions with Chris Cummings

At trial, Chris Cummings testified regarding two prior confrontations with Ruffin before the June 26, 1999 shooting. He testified that Ruffin had attempted to drive his car into Cummings three weeks before the shooting. Ruffin's account of that prior incident, however, was merely that he was trying to visit a friend and Chris Cummings and his friends were in the way. Chris Cummings testified that Ruffin then got out of his car in an aggressive manner, took a phone from one of Cummings' friends and then threw it, hitting someone in the face. Chris Cummings then apparently chased Ruffin away. About a week later, Chris Cummings saw Ruffin outside Mazzola's apartment (the same apartment where the shooting later occurred). That fact is not surprising because Ruffin lived in the same apartment complex. Chris Cummings then confronted Ruffin, who responded by running toward Cummings with his hand in his back pocket. Ruffin then slapped and kicked Cummings and then walked away, warning Cummings to watch his back. Ruffin, however, testified that Chris Cummings approached him that night and accused him of trying to run over his girlfriend the week before. Ruffins testified that Chris Cummings warned Ruffin to watch his back, rather than the other way around. That was two weeks before the shooting.

As Ruffin sees it, these prior confrontations are part of the larger story. On the night of the shootings, two weeks after the second confrontation, Chris Cummings arrived outside Mazzola's apartment after Ruffin had already showed up. At that point, Chris Cummings again accused Ruffin of trying to run him over

three weeks before and Ruffin responded that tonight was not the night to mess with him. That exchange took place before Dresser confronted Ruffin. Outside of this verbal exchange, Chris Cummings was not extensively involved in the events that ended with Ruffin firing his weapon—other than, of course, being shot by Ruffin. The evidence recited by the state court shows that Thomas Hannah, Michael Cummings, and Brad Plaza were the primary individuals that intervened after Ruffin punched Dresser in the face. And Brad Plaza was the individual that reached for Ruffin's gun.

### c. Sentence

Based on these events, Ruffin was charged with first-degree murder and two counts of aggravated battery with a firearm. Although the jury convicted him of the two aggravated battery charges, it found him guilty of second-degree murder instead of first-degree murder. The trial court then sentenced him to nineteen years for second degree murder, and twenty-five years for each aggravated battery conviction—all to be served consecutively.

### d. Initial Appeals

On direct appeal, Ruffin argued for a new trial based on various theories. But none are important to the present petition. Ruffin began his post-conviction appeals in February 2002. On October 4, 2004, he received a favorable ruling that he did not have reasonable assistance of post-conviction counsel. So, the trial court appointed an attorney to assist Ruffin, who then filed a second-amended post-conviction petition. That attorney died. The Court then appointed another attorney to

represent Ruffin. After multiple continuances that delayed the proceedings a few more years, Ruffin hired his own attorney, who then filed a third-amended post-conviction petition.

At some point in 2011, newly discovered evidence indicated that the prosecution had suppressed evidence that Chris Cummings had a prior misdemeanor battery conviction in a neighboring county.[2] Though Ruffin had asked for this type of information during the trial and pre-trial proceedings, the prosecution never produced that information to him. Ruffin initially argued for relief under *Brady v. Maryland* on other grounds. His third-amended post-conviction petition, however, only included the new claim under *Brady*, along with three other claims that were later denied.

### e. Newly Discovered Evidence—The Police Report

The evidence at the center of this habeas petition is a police report written in 1997 by the Ogle County Sheriff's Department. Dkt. 22-11, at 55–60. The underlying incident occurred on June 14, 1997. Essentially, three individuals were charged with battering Jason Kehoe at a party he attended with Kevin Armstrong and Julie Wysocki. Kehoe knew no one else there. At some point, he decided to approach and introduce himself to three men that were staring at him. They responded by burning him with a lit cigarette and punching him in the face. According to the report, Chris Cummings was the individual that punched Kehoe in the face—apparently because Kehoe had introduced himself to Chris Cummings'

---

[2] Ruffin obtained the report, which is discussed in further detail below, through a Freedom of Information Act request. *People v. Ruffin*, 2018 IL App. (2d) 170324-U, ¶ 11.

girlfriend earlier. Still, Cummings told the deputies that Kehoe had started the fight but that he was so drunk that his punch missed the target, though it prompted Cummings to punch Kehoe three or four times.

Brad Plaza then intervened by pulling Chris Cummings away from Kehoe— the same Brad Plaza that would later die after being shot by Ruffin. Unsurprisingly, Kehoe attempted to flee. But then several other individuals continued beating him. He ran toward another group of people, hoping for some help. Instead, they apparently also joined in the beating. Someone from the group then yelled out that they should throw Kehoe in the nearby bon fire. One of the individuals beating Kehoe at this point was apparently James Rozakis because the report indicates that Brad Plaza again intervened to pull Rozakis off of Kehoe. At that point, Kehoe again attempted to escape and ran to a barn. The assailants then caught up to Kehoe and continued the beating, at which point Brad Plaza once again intervened to pull them away.

Though not all witness listed in the report knew what happened or why, the general consensus was that the beating was in response to Chris Cummings' belief that Kehoe had been talking to Chris Cummings' girlfriend. When questioned by deputies, Cummings confirmed that part of the story. Cummings' contended, however, that Kehoe started the fight by taking the first swing. Cummings then responded by punching Kehoe in the face three or four times, until Brad Plaza intervened and ended it. Cummings explained that several other people then began beating Kehoe, but Cummings did not know who they were. The reporting officer

apparently did not believe that statement because Cumming also admitted that he knew the other individuals later accused of being involved in the beating.

### f. Third-Amended Post-Conviction Petition

On March 19, 2014, Ruffin filed his third-amended post-conviction petition with the Winnebago County Circuit Court. He asserted two due process violations (*Brady* and a sentencing defect) and two claims of ineffective assistance of counsel (trial and appellate counsel). After holding a hearing on the *Brady* issue, the Circuit Court held in Ruffin's favor on that claim, though it denied his other claims. Dkt. 21-5, at 286–87. The government appealed.

On August 14, 2018, the Appellate Court of Illinois, Second District, reversed the Circuit Court's decision that the prosecution had violated *Brady* and ordered Ruffin's convictions reinstated. *People v. Ruffin*, 2018 IL App. (2d) 170324-U, ¶ 1. The crux of the court's opinion was that the suppressed police report was not material under *Brady*:

> While the Cummings report suggests Cummings' possible aggression, there was no evidence at trial that Cummings acted aggressively toward defendant on the night of the shootings. It was Plaza, not Cummings, who approached defendant. Any evidence of Cummings' possible aggression would have no effect on the outcome of defendant's trial where the evidence showed that, after defendant shot Plaza, he shot both Cummings and Vella while they were running away from defendant.

*Id.* ¶ 23.

Apart from the court's determination that Chris Cummings' possible aggression made no difference on the night of the shootings, it also elaborated further reasons why the report was not material under *Brady*. The court explained

that the jury had already heard evidence of the two prior confrontations between Ruffin and Chris Cummings wherein Chris Cummings had acted aggressively. Furthermore, Chris Cummings was impeached regarding his addiction to narcotics and alcohol, a prior conviction for residential burglary, and a DUI offense. The court then indicated that further impeachment evidence may be cumulative—the court only explained that evidence must be more than merely cumulative. *Id.* ¶ 24. Looking to the weight of other evidence, the court explained that it contradicted Ruffin's self-defense claim: no one else had a weapon; Dresser was the only individual that touched him (he immediately hit her back); and instead of waiting for law enforcement, he fled the scene, stole a car at gunpoint, and led the police on a high-speed chase that ended when he was shot by police. *Id.* ¶ 25.

Thus, because of the weight of evidence at trial, the apparent cumulative nature of the impeachment evidence, and the fact that Chris Cummings was not significantly involved the events that directly led to the shooting, the court determined that confidence in verdict remained intact. *Id.* ¶ 26.

## II.    Legal Standard

State inmates seeking relief on a federal writ of habeas corpus face a high hurdle. They have two options. First, they can argue that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In other words, the state court must have reached a decision "opposite" of that reached by the Supreme Court on a question of law or a question of fact

(when the facts presented are "materially indistinguishable"). *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

Second, a state inmate seeking habeas relief can argue that the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In other words, the state court must have identified the correct legal rules, but its application of the law to the facts presented must have been objectively unreasonable. *Id.* at 409; *Winston v. Boatwright*, 649 F.3d 618, 624 (7th Cir. 2011).

In reviewing the final state court's opinions on the merits, a federal court affords the state court "great deference." *Lentz v. Kennedy*, 967 F.3d 675, 688 (7th Cir. 2020). Thus, the only question the court asks is whether the state court's "decision was unreasonably wrong under an objective standard." *Dassey v. Dittmann*, 877 F.3d 297, 302 (7th Cir. 2017) (en banc). "This provision means that on habeas review, federal courts are usually limited to a deferential review of the reasonableness, rather than the absolute correctness, of a state court's decision." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012).

## III.  Analysis

Though various arguments were made throughout the state post-conviction process, the only claim presented to this Court is that the state withheld impeachment evidence of its witness Chris Cummings in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Dkt. 1, at 9–10.

In *Brady*, the Supreme Court held that a defendant's due process rights are violated when the prosecution withholds evidence that is both exculpatory and material. 373 U.S. 83, 86–87 (1963). The Court elaborated, in *Giglio v. United States*, that *Brady* applies to circumstances in which the prosecution withholds evidence affecting the credibility of a key witness, one that "may well be determinative of guilt or innocence." 405 U.S. 150, 154 (1972) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). That does not mean that the suppression of any impeachment evidence constitutes a violation of due process. *Id.* ("We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.'" (quoting *United States v. Keogh*, 391 F.2d 138, 148 (2d Cir. 1968))).

In determining whether a petitioner's due process rights were violated under *Brady*—so that they are entitled to a new trial—federal courts apply a three-prong analysis requiring that (1) the prosecution suppressed the evidence in question, (2) the evidence is favorable to the defense, and (3) the evidence is material. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Here, the Illinois appellate court determined that the evidence was both suppressed and favorable to Ruffin. *People v. Ruffin*, 2018 IL App. (2d) 170324-U, ¶¶ 18–19. Thus, the only issue remaining in Ruffin's petition is whether the evidence is material. Dkt. 4, at 22 (arguing that the "Appellate Court acted unreasonably in three ways, all of which relate to the materiality analysis established in *Brady* and refined in later precedent").

Evidence is material under *Brady* and *Giglio* if a reasonable probability exists that the jury would have reached a different conclusion had the evidence been disclosed to the defense. *United States v. Bagley*, 473 U.S. 667, 682 (1985). That standard falls short of the preponderance of the evidence standard. *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (explaining that "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal"). Rather, reasonable probability merely requires "a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.

The evidence at issue here is a police report—described in detail above—that was taken as part of the investigation into a battery allegation against Chris Cummings, one of the prosecution's witnesses at Ruffin's trial. As Ruffin sees it, the report would have led his trial counsel to admissible evidence with which he could have impeached Chris Cummings' credibility, so that the jury would have believed that Ruffin acted reasonably in self-defense. Ruffin advances three arguments in support of his position: (1) he argues that the state appellate court's decision was contrary to established Supreme Court precedent because it required a greater standard of evidence, (2) he argues that the appellate court failed to apply the proper standard for impeachment material, and (3) he contends that the appellate court's decision was contrary to federal law because it failed to consider the cumulative effect of the suppressed evidence. Dkt. 4, at 22.

### a. A Higher Level of Proof

Ruffin's first argument asserts that the state appellate court recited the correct legal standard, but its application failed to apply that standard in a meaningful way. Dkt. 4, at 25. He contends that the court "appeared to judge the materiality of the suppressed report from the vantage of a jury trial, requiring a much higher level of proof—that the suppressed report *would* have changed the outcome of the trial." *Id.* at 26. Specifically, Ruffin takes issue with the state appellate court's focus on Brad Plaza as the initial aggressor and its statement that nothing in the report would have provided sufficient evidence to justify Ruffin shooting Plaza twice in his back: "At no point in his *Brady* arguments did Mr. Ruffin need to 'justify shooting Plaza twice in his back, resulting in Plaza's death.'" *Id.* at 27 (quoting *People v. Ruffin*, 2018 IL App. (2d) 170324-U, ¶ 7).

But the appellate court did not hold Ruffin to a higher standard. Rather, it merely recognized that the evidence would not have changed anything as a way of explaining that Ruffin had not met his burden of showing a reasonable probability that the result would have been different. In other words, the court's point was that no reasonable probability existed because the suppressed evidence related to Chris Cummings' possible aggressive tendencies, which could not have changed the outcome of the trial. The court was not ambiguous on this point:

> While the Cummings report suggests Cummings' possible aggression, there was no evidence at trial that Cummings acted aggressively toward defendant on the night of the shootings. It was Plaza, not Cummings, who approached defendant. Any evidence of Cummings' possible aggression would have no effect on the outcome of defendant's trial where the evidence showed that, after defendant shot Plaza, he shot

both Cummings and Vella while they were running away from defendant.

*People v. Ruffin*, 2018 IL App. (2d) 170324-U, ¶¶ 22–33. Thus, the court applied the correct standard. Ruffin merely quibbles with the result. But the court's decision lies well within the bounds of reasonableness. Chris Cummings, as opposed to Michael, had little to do with the events of June 26, 1999, other than being shot. Remove him from the equation and the result is almost certainly the same. Although Ruffin would have the Court view the events of June 26, 1999 as a continuation of the two prior confrontations between Ruffin and Chris Cummings, the connection is tenuous at best.

Sure, Ruffin spoke to Chris Cummings that night, and he warned Chris Cummings not to mess with him. But Jamie Hendrickson testified that Ruffin twice grabbed her inappropriately and that she then told Heather Dresser and Brad Plaza that Ruffin had grabbed her. That is the event that led to the shooting, and Ruffin's inappropriate behavior toward Hendrickson had absolutely nothing to do with his prior confrontations with Chris Cummings. Ruffin shot into the crowd and at Brad Plaza because Plaza was going for Ruffin's gun (and Ruffin apparently felt threatened by the crowd). Plaza, Hannah, and Michael Cummings approached Ruffin because he punched Dresser. He punched Dresser because she slapped him. She slapped him because of his inappropriate touching of Hendrickson (Michael Cummings' girlfriend). Thus, everything stemmed from Ruffin's inappropriate behavior toward Hendrickson. Any possible aggressive tendency that Chris Cummings might have could not possibly have changed that.

### b. Applying the Materiality Standard to Impeachment Evidence

Ruffin next argues that the state appellate court correctly identified the overall rule announced in *Brady* but "failed to identify or correctly apply the standard as it applies to impeachment evidence." Dkt. 4, at 27. Ruffin cites to, and analyzes, several important Supreme Court cases for the proposition that "when a witness is crucial to the prosecution, evidence that impeaches that witness's credibility is material." *Id.* at 29. Ruffin continues that courts should consider the overall strength of the case against the defendant, the importance of the witness's credibility, the strength of the impeaching evidence, and how that evidence compares to the other evidence the prosecution used to impeach that witness's credibility. *Id.* at 30. Of course, Ruffin's recitation of the law is correct, but his contention that the state appellate court applied a different standard is misplaced. The Court applied the correct standard and its application of the law to the facts was not unreasonable.

The state appellate court properly considered the above issues. The court expressly contemplated the effect that the impeaching evidence would have on the overall case, as described above. In so doing, the court implied that Chris Cummings' was not an especially important witness (that much is clear from the court's reasoning that Chris Cummings' did not act aggressively on the night of the shooting). The court further compared the impeachment evidence to other impeaching evidence that was presented at trial. The court contemplated the impeaching evidence of Chris Cummings' addiction to narcotics and alcohol, his DUI

offense, and his conviction for residential burglary. The court then noted that materiality requires the evidence be more than merely cumulative of the other evidence presented. In other words, the court reasoned that the impeachment evidence added little to the strength of Ruffin's case. Furthermore, as the appellate court explained, the jury heard testimony regarding the prior confrontations between Ruffin and Chris Cummings. They heard both sides of that story.

Ruffin sees Chris Cummings' prior conviction for misdemeanor battery as important because it could have aided the jury in believing Ruffin's side of that story over Chris Cummings' side. According to Ruffin, the conviction shows that Chris Cummings, not Ruffin, was the initial aggressor in those prior confrontations. But that is speculative given that Chris Cummings was already thoroughly impeached on other grounds, as the appellate court explained. And none of that really matters anyway. Even if Cummings was the aggressor in those two prior confrontations, that has no bearing on the night of the shooting. As the appellate court noted, Ruffins presented no evidence that Chris Cummings acted aggressively on the night of the shooting. Ruffin's inappropriate groping of Hendrickson prompted friends to come to her defense. And even if Chris Cummings was one of those friends, he was not a significant player. His biggest role in the events of that night was merely that he was shot in the leg while running away.  And running away from a person shooting into a crowd is not an aggressive action. Brad Plaza, Thomas Hannah, and Michael Cummings were the main individuals approaching Ruffin after he hit Dresser in the face.

But Ruffin sees Chris Cummings as a key witness, and anything that could impeach him further should be material. To be sure, the state used Chris Cummings testimony at trial; he was a victim of one on of the charged crimes after all. But that does not make him a key witness under these circumstances, and Ruffin's citations to *Giglio*, *Kyles*, *Wearry*, and *Smith* explain why.

In *Giglio*, the co-conspirator was the only witness able to link the defendant to the crime. *Giglio v. United States*, 405 U.S. 150, 151 (1972) ("The controversy in this case centers around the testimony of Robert Taliento, petitioner's alleged coconspirator in the offense *and the only witness linking petitioner with the crime*." (emphasis added)). In *Kyles*, the Court explained that "the essence of the State's case was the testimony of eyewitnesses." *Kyles v. Whitley*, 541 U.S. 419, 441 (1995) (quoting the district court's opinion). In other words, the impeachment evidence was not just possibly useful. "The likely damage is best understood by taking the word of the prosecutor, who contended during closing arguments that Smallwood and Williams were the State's two best witnesses." *Id.* at 444.

In *Wearry*, the Supreme Court explained that the prosecution's "evidence resembles a house of cards, built on the jury crediting Scott's account rather than Wearry's alibi." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016). The Court elaborated that the only evidence directly tying Wearry to the capital punishment charge "was Scott's dubious testimony, corroborated by the similarly suspect testimony of Brown." *Id.* And in *Smith*, the suppressed evidence would have impeached the sole witness that linked Smith to the crime. *Smith v. Cain*, 565 U.S. 73, 74 (2012).

There, the Court explained that "[n]o other witnesses and no physical evidence implicated Smith in the crime." *Id.*

Thus, the suppressed evidence in those cases would have impeached undoubtedly critical witnesses. Chris Cummings on the other hand, was one of almost a dozen people at the scene of the incident. His importance as a witness was largely limited to those prior confrontations with Ruffin. But he was far from the only witness to the events that took place on the night of the shooting. His contribution to the prosecution's case may have aided in Ruffin's conviction, but evidence "possibly useful" to the defense's case is not necessarily material. *Giglio*, 405 U.S. at 154. Its suppression must undermine confidence in the verdict. It does not do so here.

### c. Cumulative Effect

Lastly, Ruffin contends that the state appellate court failed to consider the noncumulative effect of the suppressed evidence. Dkt. 4, at 39. In contrast to the evidence being merely cumulative of the other impeachment evidence, Ruffin argues that the evidence cannot be viewed in a silo. Rather, it must be considered with the other evidence at trial. Even if the evidence is minimally impactful on its own, it could be the straw that breaks the camel's back. His argument correctly states the law. Though evidence may not be material on its own, it could be material considering the cumulative effect it has on the other evidence presented. *Snow v. Pfister*, 880 F.3d 857, 869 (7th Cir. 2018) ("But our analysis does not end with the conclusion that no singular piece of evidence is material on its own. The evidence

must be considered cumulatively."). But the state appellate court considered the cumulative effect of the police report on the other evidence presented. It just came to a different (and reasonable) conclusion than the one Ruffin advocates for.

The crux of Ruffin's argument here is not that the state appellate court failed to analyze the report in relation to the other evidence. Instead, Ruffin contends that the court oversimplified the value of the report and "weighed that overly simplified characterization against the state's evidence." Dkt. 4, at 40. In Ruffin's view, the court should have considered in more detail the similarities between the prior confrontations and the incident in the police report. *Id.* at 40–42. Of course, similarities do exist. A jury could have seen that Chris Cummings has had multiple incidents in which he gets into a fight over someone talking to his girlfriend, that he convinces friends to join him in attacking the victim, and that he has in the past lied to the police.

The state appellate court was presented with all of this and summed it up as showing Cummings' possible aggressive tendencies. The court then determined that regardless of whether these tendencies were true, that could not have changed the outcome of the trial because no evidence showed Cummings' aggressive tendencies on display the night of the shooting. Instead, the "other evidence contradicted defendant's claim of self-defense." *People v. Ruffin*, 2018 IL App. (2d) 170324-U, ¶ 25. And for the reasons explained above, nothing in the state court's opinion is opposite to that required of Supreme Court precedent. Furthermore, Ruffin has

pointed to no holding that represents an objectively unreasonable application of the law to the facts.

### d. Inadmissible Evidence as Material

Even if the Court were to hold the state court's opinion unreasonable, the police report would still be immaterial for an independent reason. In their briefing, the parties at times discuss the admissibility of the police report. Dkt. 23, at 9-10; Dkt. 26, at 4-5. But it is not entirely clear that the parties are discussing admissibility in the same context.

Although the trial court determined that evidence of prior criminal conduct would be allowed to impeach government witnesses, it never ruled on the admissibility of the police report in question. The police report was discovered more than ten years after the trial—though the Circuit Court admitted the report for the purpose of the *Brady* hearing in the initial post-conviction proceedings on the third-amended petition. As the government points out, however, the report is littered with hearsay.

The issue of whether inadmissible evidence can be material under *Brady* is not entirely settled. There is a circuit split. *See Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 310 (3d Cir. 2016). In *Wood v. Bartholomew*, the Supreme Court held a polygraph test immaterial under *Brady* because the results were undoubtedly inadmissible and disclosure of the results "could have had no direct effect on the outcome of the trial." 516 U.S. 1, 6 (1995). That opinion has been interpreted to mean different things. Since *Wood*, some circuits have not taken the Supreme

Court's holding in *Wood* as announcing a *per se* rule. *See, e.g.*, *Dennis*, 834 F.3d at 310; *Barton v. Warden*, 786 F.3d 450, 466–67 (6th Cir. 2015) (explaining that inadmissible evidence may still be material under *Brady* if it directly leads to admissible evidence); *Banks v. Workman*, 692 F.3d 1133, 1142 (10th Cir. 2010) (determining that inadmissible evidence is not material under *Brady* unless it is reasonably likely to lead to admissible evidence that undermines confidence in the verdict).

In contrast, other circuits have held that *Wood* established a *per se* rule. *See, e.g., Hoke v. Netherland*, 92 F.3d 1350, 1356 n.3 (4th Cir. 1996).[3] The Seventh Circuit likewise holds that inadmissible evidence cannot be material. *Jardine v. Dittmann*, 658 F.3d 772, 776–77 (7th Cir. 2011) ("But not all suppressed evidence that has some tendency to exculpate or impeach is material under *Brady*, and relief may be granted only if introducing the evidence would have cast 'the whole case in such a different light as to undermine confidence in the verdict.' Logically, inadmissible evidence is immaterial under this rule.") (cleaned up); *see also United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995). In *United States v. Morales*, the Seventh Circuit recognized its existing rule that inadmissible evidence is not material for *Brady* purposes, but winked at the notion that it might "entertain the

---

[3] Even the Fourth Circuit, which previously endorsed a *per se* rule, later used language similar to that of other circuits: "Therefore, Scott's polygraph results could be material – within the meaning of *Brady* – only if their disclosure would have been reasonably likely to result indirectly in a different trial outcome – for instance, if disclosure would have led trial counsel to conduct additional discovery that would have led to important admissible evidence." *Goins v. Angelone*, 226 F.3d 312, 325–26 (4th Cir. 2000) (internal quotation marks omitted).

idea of reconsidering [its] approach." 746 F.3d 310, 315 (7th Cir. 2014). Despite this comment in *Morales*, the law in the Seventh Circuit remains: inadmissible evidence is not material. *See Snow v. Pfister*, 240 F. Supp. 3d 854, 891 (N.D. Ill. 2016) ("*Morales* therefore underscores that the existing rule requiring admissibility remains in place."). District courts follow precedent, not a panel's indication to be inclined to adopt a different view. *Id.* at 890. District courts follow precedent until the Court of Appeals or Supreme Court overrules that precedent. *Bontrager v. Ind. Family & Soc. Servs. Admin.*, 829 F. Supp. 2d 688, 694 (N.D. Ind. 2011) ("Just as courts of appeal must follow Supreme Court precedent, so to must district courts follow decisions by courts of appeal unless and until they have been explicitly overturned.") (*citing Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994); *see also Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

To the extent Ruffin is arguing that the inadmissible police report itself was material—and he does not seem to be making that point, Dkt. 26, at 4-5—binding Seventh Circuit authority rejects that argument.  To the extent Ruffin is arguing the views of other circuits—an argument this Court cannot accept—Ruffin would still not prevail.

Under either rule, the result is the same: the police report is not material. Under Seventh Circuit precedent, the inadmissible police report is not material. *Jardine*, 658 F.3d at 776–77 .  Under other circuits' decisions—which this Court cannot follow in the face of binding Seventh Circuit precedent—the police report is

still not material. Under the other circuits' decisions, the inadmissible evidence must sufficiently lead to admissible evidence, so that the disclosure of the inadmissible evidence is still reasonably likely to lead to a different result at trial and the court is not improperly drawn into speculation. *Wogenstahl v. Mitchell*, 668 F.3d 307, 325 n.3 (6th Cir. 2012) ("At the same time, a federal court's conclusions that such inadmissible material would 'lead' to admissible, exculpatory evidence cannot be based on 'speculation with slight support.'" (quoting *Wood*, 516 U.S. at 8)); *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999) (explaining that inadmissible evidence can still be admissible but "[a] court cannot speculate as to what evidence the defense might have found if the information had been disclosed").

Any conclusion that the police report is material would require this Court to improperly speculate regarding the result of an investigation by defense counsel. The state appellate court recognized this: Former defense counsel "Pumilia stated that, on the face of it, part of the Cummings report reflected badly on Cummings, but part of it would reflect positively on Plaza. Pumilia could not definitively say whether or not he would have used the Cummings report at defendant's trial. Pumilia further testified that he would have been concerned that Cummings' battery information could have led to a mini-trial and distracted the jury." *People v. Ruffin*, 2018 IL App. (2d) 170324-U, ¶ 13.

As former defense counsel indicated, the police report may help Ruffin because it presents Chris Cummings' in a negative light. But it also paints Brad Plaza in a significantly positive light. Unlike Chris Cummings, who noticed Ruffin

that night and "did not want to speak [to him] based on their prior interactions,"

dkt. 4, at 10, Brad Plaza was the person chasing Ruffin and reaching for his gun, *id.*

at 11 ("Mr. Ruffin believed that if Mr. Plaza got the weapon, that he or someone else

in the group would use it to shoot Mr. Ruffin. At that time Mr. Ruffin shot his gun:

two shots towards the group of men running at him, and then more shots towards

the ground."). In effect, the police report shows that the individual Ruffin killed was

a peacemaker that broke up fights and came to Jason Kehoe's aid multiple times.

Thus, because the report paints Brad Plaza as a peacemaker, any suggestion that

the report would have been used by defense counsel is purely speculative.

Therefore, the police report is not material under *Brady*.

## IV.     Certificate of Appealability

Rule 11(a) of the Rules Governing § 2254 Cases requires that the Court issue

or deny a certificate of appealability when it enters a final order adverse to a

petitioner. A habeas petitioner is entitled to a certificate of appealability only if he

can make a substantial showing of the denial of a constitutional right. *See Miller-El

v. Cockrell*, 537 U.S. 322, 327 (2003) (citing 28 U.S.C. § 2253(c)(2)). To make that

substantial showing, the petitioner must establish that "reasonable jurists could

debate whether (or, for that matter, agree that) the petition should have been

resolved in a different manner or that the issues presented were 'adequate to

deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484

(2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)); see *Lavin v.

Rednour*, 641 F.3d 830, 832 (7th Cir. 2011). "The question is the debatability of the

underlying constitutional claim, not the resolution of that debate." *Miller-El*, 537 U.S. at 342.

As explained above, Ruffin faces a high hurdle. Essentially, he must show that the Illinois appellate court's opinion was unreasonable. He has failed to do so. Existing Supreme Court precedent explains why Chris Cummings was not a key witness. No reasonable probability exists that disclosure of the police report would have changed the outcome of Ruffin's trial. And, even accepting those circuit court decisions looking past the Supreme Court's holding in *Wood*, federal courts are not permitted to speculate. A finding of materiality here would require the Court be drawn into impermissible speculation. For those reasons, the Court does not find the question debatable. A certificate of appealability will not issue.

## V.    Conclusion

For the reasons stated above, Ruffin's petition for a writ of habeas corpus [1] is denied, and the Court declines to issue a certificate of appealability.

Date:  July 6, 2021

_____
Honorable Iain D. Johnston
United States District Judge
Northern District of Illinois
Western Division